**IDEAL CEMENT COMPANY, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. No. 6384.

United States District Court
D. Colorado.

Nov. 11, 1966.

James L. White, and Claude M. Maer, Jr., of Holland & Hart, Denver, Colo., and Harry R. Horrow, and John G. Clancy, of Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff.

Lawrence M. Henry, U. S. Atty., David I. Shedroff, Asst. U. S. Atty., Denver, Colo., and Mitchell Rogovin, Asst. Atty. Gen., and Jerome Fink, Dept. of Justice, Washington, D. C., Thomas F. Field, Lawrence E. Doxsee, Attys., Dept. of Justice, Washington, D. C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW.

KERR, District Judge.

This matter came on for trial before the Court, the plaintiff being represented by James L. White and Claude M. Maer, Jr., of the firm of Holland & Hart, and Harry R. Horrow and John G. Clancy of the firm of Pillsbury, Madison & Sutro, and defendant being represented by Lawrence M. Henry, United States Attorney, David I. Shedroff, Assistant United States Attorney, Mitchell Rogovin, Assistant Attorney General, Wash-

ington, D. C., Jerome Fink, Thomas F. Field, Lawrence E. Doxsee, Attorneys, Department of Justice, Washington, D. C., its attorneys; and the Court having heard the evidence and the statements of counsel, took said matter under advisement; and having carefully examined the entire record on file herein and the briefs filed by counsel, and being fully advised in the premises, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT.

1. This is a civil action in which plaintiff seeks a refund of federal income tax and excess profits taxes in the amount of $1,146,074.83, plus interest, paid for the years 1951 through 1954.

2. The questions to be decided by this Court are:

(1) With respect to the classification of minerals, viz: (A) Whether the calcareous material mined in Ada, Oklahoma, constitutes chemical or metallurgical grade limestone as claimed by Ideal and depletable at a rate of 15%, or whether it constitutes ordinary calcium carbonates as claimed by the Government and depletable at a rate of 10%; (B) Whether the argillaceous material mined at Ada, Oklahoma, is clay depletable at a rate of 15% as contended by Ideal, or whether it is shale depletable at a rate of 5% as contended by the Government; and (C) Whether the calcareous material mined by Ideal at its Gold Hill, Oregon, plant is ordinary calcium carbonate depletable at a rate of 10% as contended by Ideal, or whether it is marble depletable at a rate of 5% as contended by the Government.

(2) With respect to the computation of gross income from mining, viz: (A) Whether the mining process includes the processing of pre-kiln feed additives, that is, whether it includes drying, grinding, or blending minerals not mined by the taxpayer; (B) Whether gross income from mining includes gross income from certain cement marketing activities; (C) Whether the first marketable product is cement in bags or bulk cement; and (D) Whether the cost of shipping cement to Salt Lake City earned a proportionate profit, and how to treat that cost.

(3) With respect to the statute of limitations, viz: Whether the statute of limitations bars the taxpayer's claim for 1951 and 1952 that the material mined by Ideal at Ada, Oklahoma, is chemical or metallurgical grade limestone, and whether it bars taxpayer's claim for 1954, that the Ada argillaceous material is clay and not shale.

3. The plaintiff, Ideal Cement Company, hereinafter referred to as "Ideal", is and during the years 1951 through 1954 was a corporation organized and existing under and by virtue of the laws of the State of Colorado. During the years 1951 through 1954, Ideal's corporate headquarters and central office were located in Denver, Colorado. During the years 1951 and 1952 the Pacific Portland Cement Company, hereinafter referred to as "Pacific", was a corporation organized and existing under and by virtue of the laws of the State of California with its corporate headquarters and central office in San Francisco, California. Pacific merged into Ideal on December 31, 1952, pursuant to a duly-consummated statutory merger. Ideal has brought this suit both on its own behalf and in its capacity as successor by statutory merger to Pacific. For convenience, "Ideal" or "plaintiff" hereafter means both the Ideal Cement Company and the Pacific Portland Cement Company, unless a different usage of terms is specifically indicated.

4. During the taxable periods at issue herein, Ideal was an integrated miner and manufacturer whose principal product consisted of various types of portland cement.

5. During the taxable periods at issue herein, Ideal and Pacific (the latter for the year 1951), maintained their books and accounts on a calendar year basis and by use of the accrual method of accounting.

6. The taxable periods placed at issue by the amended and supplemental complaint, as amended, are Ideal's calendar years 1951, 1952, 1953, and 1954, and Pacific's calendar year 1951.

7. Ideal's mining and manufacturing operations during the period covered by this litigation were conducted at thirteen sites located at Ada, Oklahoma; Baton Rouge, Louisiana; Boettcher, Colorado; Devil's Slide, Utah; Gold Hill, Oregon; Houston, Texas; Mobile, Alabama; Okay, Arkansas; Portland, Colorado; Redwood City, California; San Juan Bautista, California; Superior, Nebraska; and Trident, Montana.

8. During the years 1951 through 1954, Ideal made portland cement by use of the wet process of production at all of its plants except for the plants at Boettcher, Colorado; Trident, Montana; and Plant No. 1 at Portland, Colorado. At those three latter plants, the dry process of production was used. At all of its plants Ideal utilized the ordinary treatment processes normally used by integrated miner-manufacturers of portland cement.

9. During the period covered by this litigation, Ideal had sales offices at Butte, Montana; Denver, Colorado; Houston, Texas; Little Rock, Arkansas; Mobile, Alabama; New Orleans, Louisiana; Oklahoma City, Oklahoma; Omaha, Nebraska; Portland, Oregon; Salt Lake City, Utah; and San Francisco, California.

10. During the period covered by this litigation, Ideal had a warehouse in Salt Lake City, Utah, which served the Devil's Slide, Utah, plant. Ideal shipped cement in bags by commercial rail transportation from the Devil's Slide plant to the Salt Lake City warehouse.

11. During the period covered by this litigation, Ideal had a distribution terminal in New Orleans, Louisiana, which served the Baton Rouge, Louisiana, and Mobile, Alabama, plants. Ideal shipped cement in bulk by owned barges and contracted tugs from the Mobile and Baton Rouge plants to the New Orleans distribution terminal. A portion of this cement was then bagged at the terminal and the remainder was shipped from the terminal in bulk.

12. During the period covered by this litigation, Ideal sold finished cement both in bulk and in bags.

13. Neither Ideal nor any other individual or firm in the United States sold kiln feed in commerce during the period covered by this litigation in such a way as to establish a field or market price for kiln feed during those years.

14. Pursuant to extensions duly granted, Ideal filed its income tax returns for the years indicated on the dates specified: 1951, June 13, 1952; 1952, June 12, 1953; 1953, April 13, 1954; 1954, June 13, 1955. Pacific filed its 1951 income tax return pursuant to a duly-granted extension on July 14, 1952.

15. Ideal filed claims for refund for the years indicated on the dates specified, contending that it was entitled to greater deductions for percentage depletion than it had claimed on its original return for the reason that gross income from mining should be computed on the basis of the sales price of the finished cement: 1951, March 15, 1955; 1952, March 14, 1956; 1953, March 12, 1957; 1954, November 19, 1957. Pacific filed a claim for refund for the year 1951 on the same basis on March 15, 1955.

16. On February 13, 1959, Ideal filed amended claims for refund for the years 1951, 1952, and 1953 in which it claimed, among other things, that the calcareous material mined by it at Ada, Oklahoma, constituted chemical grade limestone depletable at a rate of 15% rather than ordinary calcium carbonates depletable at a rate of 10% as reported in its original income tax returns. The Government claims that Ideal's contentions in this regard are barred by the statute of limitations for the years 1951 and 1952. The Government concedes that Ideal's claim for 1953 is not barred but that a refund can be granted relating to this issue which is not in excess of the deficiency in income taxes paid by Ideal for 1953 on February 5, 1959.

17. As a result of an audit by representatives of the Internal Revenue Service, Ideal paid on February 5, 1959, a deficiency for the year 1953 in the amount of $529,669.13 in income taxes and $163,371.88 interest.

18. As a result of an audit by representatives of the Internal Revenue Service, Ideal paid on February 5, 1959, a deficiency for the year 1954 in the amount of $148,777.50 in income taxes and $34,707.57 interest.

19. On April 15, 1959, the Government formally denied by registered or certified mail Ideal's amended claims for refund for the years 1951 through 1954 and Pacific's amended claim for refund for 1951. This was preceded by a so-called "thirty day letter" dated March 20, 1959, to which was appended an engineer's report showing investigation and consideration, *inter alia*, of plaintiff's calcareous deposit at Ada, Oklahoma.

20. Ideal brought this action against the United States on April 21, 1959, on which date it filed its complaint.

21. Ideal elected, under the provisions of Sec. 302(c) of the Public Debt and Tax Rate Extension Act of 1960, P.L. 96–564, 74 Stat. 290, as amended by Section 4 of the Act of September 14, 1960, P.L. 86–781, 74 Stat. 1017, to compute its gross income from mining under the provisions of Section 613(c) (4) (F) of the Internal Revenue Code of 1954, as amended by Section 302(b) of the Public Debt and Tax Rate Extension Act of 1960.

22. Pursuant to the provisions of the Public Debt and Tax Rate Extension Act cited in the preceding paragraph, Ideal on February 28, 1961, duly filed amended returns for the years 1951 through 1954, computing its gross income from mining under the provisions of said Act.

23. In its amended return for the year 1954, filed February 28, 1961, Ideal made the contention for the first time that the argillaceous material which it mined at Ada, Oklahoma, constituted clay depletable at a rate of 15% rather than shale depletable at a rate of 5% as reported on its original income tax return for the year 1954.

24. On December 3, 1962, Ideal filed an amended and supplemental complaint in which it claimed that the argillaceous material mined at Ada, Oklahoma, was shale rather than clay.

25. On January 17, 1963, the Government filed its answer to the amended and supplemental complaint in which it denied that the argillaceous material mined at Ada, Oklahoma, was clay and further contended that Ideal's claim of clay contained in its amended return was barred by the statute of limitations.

26. The parties have agreed and stipulated and the Court so finds that the material dredged from San Francisco Bay and used in the manufacture of cement at Ideal's Redwood City, California, plant for the years 1951, 1953, and 1954 constituted shell depletable at a rate of 5%.

## FINDINGS RELATING TO THE MINERAL IDENTI-FICATION ISSUES.

27. Plaintiff at Ada, Oklahoma, during the periods here involved mined a calcareous deposit for use in the production of portland cement which qualifies for depletion as chemical or metallurgical grade limestone.

28. Treasury Regulations 118 (1939 Code), Section 39.23(m)–5(b), purports to set at 95% by weight the minimum calcium carbonate and magnesium carbonate as qualification for treatment as chemical or metallurgical grade limestone.

29. The reasonably contemporaneous analyses conducted by plaintiff in the ordinary course of its business on a monthly basis for quality control disclose the following annual averages for applicable carbonate content: 1951, 94.38%; 1952, 96.58%; 1953, 95.21%. The foregoing are weighted according to tonnage produced per month and the average for the three years is 95.35%.

30. Plaintiff's Ada calcareous material met the standard of the Treasury

Regulation referred to above for the periods here involved.

31. The carbonate content of chemical or metallurgical grade limestone may vary from 93% to 98%.

32. Plaintiff's Ada calcareous material constituted chemical or metallurgical limestone during the periods here involved within the meaning of § 114(b) (4) (A) (iii), of the Internal Revenue Code of 1939.

33. Plaintiff at Ada, Oklahoma, also mined an argillaceous material which, for 1954, it claims is clay. The Government contends that it is shale.

34. The term "clay" encompasses a material that has plastic properties and is composed of particles of very fine size and grains which are what is commonly understood in the art to be clay minerals.

35. The important area of difference between the parties appears to be whether or not the plastic properties must be evidenced by the material in place. The testimony and exhibits at the trial showed that the involved material becomes readily plastic and disaggregates when mixed with water either upon laboratory type of experiment or in a wash mill which is used to handle clay and not shale.

36. Plaintiff has sustained by a preponderance of the evidence that a mineral possessing the properties of fine particles of clay minerals, which is the case with plaintiff's Ada argillaceous deposit at Ada, need not exhibit plasticity in place in order to qualify as clay so long as the material can become plastic when wetted.

37. Plaintiff's Ada argillaceous material was demonstrably plastic when subjected to moisture.

38. The argillaceous material at Ada displayed the properties of plasticity in place.

39. Shale is a material which may be composed of fine size particles of clay minerals, but it does not become plastic when wet. Shale possesses the distinguishing characteristics of induration, lamination and fissility.

40. Plaintiff's Ada argillaceous material is not indurated, i. e., it is not hardened by great pressure or cementation or heat, it is not laminated and demonstrably it does not possess the property of fissility.

41. The material mined by plaintiff at Ada, Oklahoma, is a clay and not a shale or other mineral.

42. A dispute exists between the parties on the question of whether the material which plaintiff mines near Gold Hill, Oregon, constitutes a calcium carbonate not sufficiently recrystallized or metamorphosed to be called a marble, or whether said calcareous material is marble as contended by the government.

43. The material at Gold Hill has not been extensively but only partially or minimumly recrystallized or metamorphosed, whereas marble is an end product of metamorphism.

44. The Gold Hill material is fractured and breaks profusely into small irregular blocks and thus is not suitable nor useable as a dimension stone.

45. There is some indication of an intrusion of an igneous material for a matter of inches in comparison with hundreds of feet of unaffected limestone. This is minimal, is discarded for cement manufacture purposes and does not serve to identify the material as a marble. Nor does the fact that parts of it may take a polish serve to so identify it.

46. Plaintiff has sustained by a preponderance of the evidence that the Gold Hill material should be classified as a limestone substantially the same as the calcareous material at Ada, Oklahoma.

### FINDINGS RELATING TO THE PROPORTIONATE PROFITS ISSUES.

47. During the years in suit, plaintiff produced, sold and distributed cement. The cement emerged from the production facilities and was deposited in silos at the various plants in bulk form.

**600**

48. Plaintiff sold bulk cement directly from the silos, or at New Orleans after transporting it to the silos at the distribution terminal there.

49. Some bulk cement was put in bags at the plants and at the New Orleans terminal. Plaintiff sold cement in bags at the plants, the New Orleans distribution terminal and a Salt Lake City warehouse. Plaintiff charged an additional price for the cement in bags. This is the bag premium.

49A. Plaintiff's total sales of cement in bulk and in bags are plaintiff's sales of its first marketable product to be used in the proportionate profits computation.

50. Plaintiff incurred the following additional costs for bagged cement that it did not incur for bulk cement: The cost of placing the bulk cement in the bags, and the cost of the bags.

51. The cost of placing the bulk cement in bags, and the cost of the bags are related or attributable to the pre-kiln processes and the post-kiln processes resulting in cement and should be allocated to these processes on the basis of the direct costs of the pre-kiln processes and the direct costs of the post-kiln processes resulting in cement.

52. Plaintiff incurred the following costs in the production, sale and distribution of cement:

(a) The production of cement: These costs were incurred in the following activities:

The quarrying of the mineral, the transportation of the mineral to the crushing facilities, the operation of the crushing facilities, the transportation from the crushing facilities to the plant, the storage of the crushed material at the plant, in some cases the addition of purchased sand, sandstone and iron ore, the drying and grinding of the materials, the blending of the raw materials and the burning of the mixture in the kiln, the cooling of the clinker which emerged from the kiln, the addition of gypsum, the grinding of the mixture and the conveying of the material to the silos.

(b) The distribution of cement: These costs were incurred in the following activities: The placing of some of its cement in bags.

The loading of cement into the customers' railroad cars or vehicles, the transportation of cement by barges towed by contract tugs from the Mobile and Baton Rouge plants to the New Orleans distribution terminal, the loading of cement into the customers' cars or vehicles at the terminal and the operation of the terminal.

(c) The costs of selling cement: Plaintiff incurred selling costs in the following activities:

The solicitation of sales by salesmen, the operation of sales offices, and the advertising of its product.

53. Plaintiff made annual payments to the Portland Cement Association which was an organization which gave technical training to plaintiff's salesmen, widely advertised the uses of portland cement, provided technical assistance to users of that product and provided assistance to the industry with regard to plant safety.

54. In its proportionate profits computation, plaintiff has allocated all the costs incurred in distributing and selling cement except those costs treated in Finding No. 51 and its payments to the Portland Cement Association to the pre-kiln and post-kiln production processes on the basis of the direct costs of the pre-kiln processes and the direct costs of the post-kiln processes resulting in cement. All these costs are related or attributable to the pre-kiln processes and the post-kiln processes resulting in cement. All these costs are related or attributable to the mineral product and the manufactured product. This allocation is in accord with good accounting practices and is reasonable.

55. The term "process" in the accounting profession means an activity involved in the production or manufacture of a marketable product.

56. The term "process" in the minerals processing field and in the chemical

process industry means an activity producing a chemical or physical change in a mineral.

57. Plaintiff operated a warehouse at Salt Lake City. Plaintiff's proportionate profits computation allocates the cost of operating this warehouse to the pre- and post-kiln processes resulting in cement on the basis of the direct costs of each set of processes.

58. The costs of operating this warehouse are related or attributable to the pre- and post-kiln processes resulting in cement. These costs are related or attributable to the mineral product and the manufactured product.

59. The allocation of these costs is in accord with good accounting practice and is reasonable.

60. Plaintiff shipped cement in bags by common carrier from its plant at Devil's Slide, Utah, to its Salt Lake City warehouse. Plaintiff charged its customers at the Salt Lake City warehouse an extra charge which was equal to the amount of freight paid to the common carrier. This cost of freight was matched by the extra charge. It earned no profit.

61. At certain of its plants, plaintiff added purchased iron ore or sand or sandstone to its raw materials just before they were introduced into the raw mills for fine grinding. These "additive" materials were subjected to grinding and blending together with plaintiff's own materials. The grinding and blending of these "additive" materials was merely incidental to the grinding and blending of plaintiff's own materials.

## CONCLUSIONS OF LAW.

1. The Court has jurisdiction over the parties and subject matter of this action.

2. The claim relating to the Ada, Oklahoma, calcareous material for the years 1951 and 1952 is not barred by the statute of limitations.

3. Plaintiff's 1954 claim that the argillaceous material at Ada, Oklahoma, is clay is not barred by the statute of limitations.

4. Plaintiff's Ada, Oklahoma, calcareous deposit is chemical or metallurgical grade limestone.

5. Plaintiff's Ada, Oklahoma, argillaceous deposit is clay.

6. Plaintiff's Gold Hill, Oregon, calcareous deposit is a limestone or calcium carbonate.

7. The bagging activities and the costs of bags and bagging must be attributed to the pre- and post-kiln processes resulting in cement. These are the mining and manufacturing processes.

6A. The plaintiff's 'first marketable product' under Section 39.23(m)–1(e)(3) of Treasury Regulations 118 (1939 Code) is cement.

8. All the costs incurred in the production, sale and distribution of cement must be attributed to the pre- and post-kiln processes resulting in cement. These are the mining and manufacturing processes.

9. The selling and distribution activities and their costs relate or are attributable to the mining and the manufacturing processes.

10. The cost of freight from the Devil's Slide, Utah, plant to the Salt Lake City warehouse and the extra charge made to the customers at Salt Lake which was equal to this freight cost should be excluded from the proportionate profits computation.

11. The grinding and blending of pre-kiln additives was incidental to the grinding and blending of plaintiff's own materials. The costs of this grinding and blending are direct costs of mining processes.

12. Counsel will collaborate and submit proposed judgment in conformity with these Findings of Fact and Conclusions of Law within thirty (30) days of this date.